RIMM, J.T.C.
Once again, as happens all too frequently in local property tax matters, this court is asked to substantially reduce a taxpayer’s tax burden on the basis of unsupported expert opinion evidence. And once again there is no basis for a finding of value, and the complaints are dismissed.
For the tax years 1976 through 1980, inclusive, the borough assessed the property at values established in its revaluation program originally effective for the 1974 tax year as follows:
Land $ 62,850
Improvements 830,000
$ 893,850 Total
For the tax year 1976 the Monmouth County Board of Taxation judgment fixed the assessment as follows:
Land $ 62,850
Improvements 780,800
Total $ 843,650
*356 For the tax years 1977, 1978 and 1979 judgments were entered by the county board of taxation in the same amount as follows:
Land $ 62,850
Improvements 830,800
Total $ 893,650
Petitions for 1976,1977 and 1978 were filed with the Division of Tax Appeals and transferred to the Tax Court by operation of law. N.J.S.A. 2A:3A-26. The complaints for 1979 and 1980, which latter year was a direct appeal pursuant to N.J.S.A. 54:3-21, were filed with the Tax Court, and all matters were consolidated for trial.
The subject property, Block 234, Lot 13A, known as 1382 Ocean Avenue and Yacht Harbor Apartments, is a two-story brick, garden-type apartment complex: It contains 52 apartments on a lot 150 feet by 480 feet, with frontage on Ocean Avenue and extending to the Shrewsbury River. There is ample open parking on a paved parking area. Construction was completed in 1971. The tenants pay for their own electricity for heating and cooking. There is laundry equipment on the premises on a concession basis. Each apartment is furnished with certain appliances and full carpeting, and each has a wood-framed terrace. There are garbage dumpsters, concrete walks and landscaping. The complex is in good condition and is located in a neighborhood which has similar garden-type apartment projects. The property’s net operating income was stipulated as $108,289 for 1976; $113,764 for 1977; $120,209 for 1978; $124,740 for 1979 and $131,283 for 1980.
The present owner testified that he purchased the property on March 1, 1978 for $1,100,000: the price was increased to get' a favorable second mortgage loan from the seller and in recognition of the assumption of the first mortgage obligation at less than market interest; the assumed first mortgage obligation had a balance of $757,047.27 and was payable monthly with interest at 9V4% a year; the second mortgage for $165,000 had a term of ten years at 6% interest a year without principal amortization, and the amount of cash paid was $177,952.73. Without objection, he testified that, in his opinion, the purchase *357 price was increased by $150,000 to $200,000 to reflect the favorable financing obtained at the time of purchase.
Plaintiffs’ appraisal expert testified that he relied almost exclusively on the income approach to value except for his use of the sale of the subject property as a comparable sale. Based on this sale only, the property had a value of $970,000. In arriving at this opinion he adjusted the price, based on market interest rates, as follows:
Item Sale Expert’s Opinion
First mortgage 757,047 $ 700,000
Second mortgage 165,000 90,000
Cash at settlement 177,953 180,000 (rounded)
1,100,000 $ 970,000
His testimony on the interest rates used in adjusting the first and second mortgages is set forth as an example of an extensive opinion lacking substance and acceptable factual support for the witness’ conclusion:
... The sale also included a purchase money second mortgage carrying an interest rate of 8% with a five-year [1] life and that mortgage had a written amount — was in the written amount of $165,000. Total of the three items gave the purchase price of one million one. I’ve made my own analysis of the sale, and, based upon the sale only, I found value in the amount of $980,000 [sic ]. I did this by taking the cash at its rounded value of $180,000. I used the first mortgage and felt that normally at that time, from my own experience and from data submitted in the appendix of my report [2] as to other interest rates for first mortgages on apartment houses during that time period, generally a 10% interest rate prevailed. Altering the first mortgage to 10%, rather than the 974% the interest rate that it was written on and it is written for in 1973, when it was originally written, I would discount that mortgage to a value of $700,000. As to the second mortgage, this is a little bit harder to approximate the true value of that mortgage, but I feel that because of the large amount of the first mortgage, the second mortgage has a very risky position and I believe that second mortgage money, in fact I know that fir — the second mortgage money available at that time in 1978, was requiring a interest rate in the *358 neighborhood of 14 to 15% minimum to be on a conservative basis. To discount that mortgage to a 15% interest rate, it would give a value of $90,000. Again, I would discount the sale, therefore, to $180,000 cash, $700,000 value of the first mortgage, $90,000 value to the second mortgage, for a total of $970,000.
An adjusted purchase price without any basis for the interest rates used in the adjustments is of no help to the court in determining value. Brick Assoc. v. Brick Tp., 4 N.J.Tax 510, 517 (Tax Ct.1982). An opinion, no matter how extensively presented in the witness’ testimony, must be supported by facts in the record.[3]
For each year the expert also used the building residual technique in the income approach to value. He used the same land value of $104,000 for each of the five years under appeal. The testimony relating to land value was as follows:
I arrived at a land value by taking 52 apartments times $2,000 per apartment. Therefore the land value would be $104,000. This is in contrast to the actual assessment of $62,850. I felt that a more realistic land value should be used even though I was using a building residual approach.
No basis was given for the opinion of land value. Yet, it is clear that “[i]n the building residual technique the land is valued separately,____” American Inst. of Real Estate Appraisers, The Appraisal of Real Estate, (7 ed.), 403. In Brick Associates the court said: “The building residual method in the income approach used by the plaintiff’s expert is rejected because there is no basis for the land value used.” 4 N.J.Tax at 513. The method is similarly rejected in this case.
Even though the building residual method is rejected, if a value can be determined from all the evidence, the court should determine the value and use it as the basis for a judgment fixing the assessment. Samuel Hird & Sons, Inc. v. Garfield, 87 N.J.Super. 65, 208 A.2d 153 (App.Div.1965); Rek Investment Co. v. Newark, 80 N.J.Super. 552, 194 A.2d 368 *359 (App.Div.1963). Since net operating income was stipulated, if an overall capitalization rate can be determined from the totality of the testimony, the court will use it to determine value. However, the witness’ opinion of capitalization rates was unsupported by any facts acceptable to the court and is rejected. Atlantic City v. Atlantic Cty. Bd. of Tax., 2 N.J.Tax 30 (Tax Ct.1980). Extensive exerpts of the witness’ testimony are set forth as examples of opinions lacking support in the market:
Q. ... Would you explain to the court, please, the computations [for the year 1976]?
A. Using the land value of $104,000 I applied an 8V2% return to the land,____ I’ve taken, therefor $11,596 of the income attributable to the land, leaving a net income to the building of $96,693. I used again the same 872% safe rate, return rate. I added a two percent risk rate or recapture rate [4] which might indicate a 50-year remaining economic life. I would explain that rate, I think that’s a very conservative rate, it’s based upon fairly new construction, there are some disadvantages in the construction especially to the electric heat item, which is considerably costly and it certainly does have an effect upon economic depreciation really. And there is no rent control and that’s a favorable item. If there was rent control I would think I would use a higher risk rate or recapture rate.[5] I’ve used a 2% recapture rate and the same 2.65 effective tax rate. A 13.15 cap rate to the improvements, which based upon the net income to the building of $96,693, would support a value to the improvements of $735,300, ... as of October 1, 1975 for the year 1976...
Q. ... [W]hat is the basis for your 8.5% return rate?
A. I believe that that is generally a safe rate that investors would have— would be — would use in approximating value for this type of property. It is the same rate that I would use on any piece of property, any piece of similar property, garden apartment-type investment property, almost throughout the State of New Jersey. It is what I feel investors would want as a minimum return on their invested dollars as of that time frame, based upon other investment opportunities that they would have. That I call the safe rate. As to the improvements I’ve added a risk rate [6], which I think would encompass the depreciation of the improvements, and also give weight to the economic depreciation in the general neighborhood and the *360 risk involved in this type of investment opportunity. And that rate has been added only to the cap rate for the improvements. That rate is the 27°.
Q. Now, in developing these rates, did you look to any similar investment opportunities available to investors?
A. Yes, I did. Of course I compared that to the — the other investment opportunities I thought were listed in the appendix of my report, but might be found in the various other statistics shown on pages 20 through 24. Obviously I do show the prime rate and the interest rates as they prevailed during this entire period. Investing in real estate certainly has advantages, income tax advantages, certainly has disadvantages as to disposing of the property, the risks involved in the environment within New Jersey as to rent control and these advantages and disadvantages are weighed and one various interest rate is arrived at. I would testify that I have spent a great deal of my time involved in buying and selling property for family interests and have consulted with various partnerships, syndications and other investors and sellers, and am quite aware as to what they were— what interest rates or personal return rates that they were interested in using for this type of investment opportunity over this entire five-year period.
So much for 1976. For 1977 the witness said he raised the “return” rate from 8V2% to 9% for land and building and used the same recapture rate as 1976. The higher rate was explained as follows:
Q. What is the basis of the higher return rate?
A. I felt that at this — during this period interest rates were beginning to stabilize at higher levels. In the earlier period based upon October 1975, the prime rate had risen, but there was questions as to its going to be able to continue with those higher rates. It appears that beginning in 197 — end of 1976 and 1977 those rates began to stabilize themselves at the higher level and I believe investors were then therefore looking for a higher return on their investments, and I therefore raised my rate to 97°.
The same unsupported testimony was presented for 1978 and 1979. For 1979, among other things, the witness said:
Again the 9lk7° return for both the safe rate for land and building is based upon prevailing market conditions as of October 1, 1978, other investment opportunities, my knowledge of what investors were looking for at that time in the investment — in acquiring this type of investment opportunity.
For 1980 the witness said that he increased the “safe return to 10%, again based upon prevailing market conditions as of October 1, 1979.”
The only other evidence in the record of capitalization rates are the average interest rates and average capitalization rates derived from commitments for $100,000 and over on multifami *361 ly and nonresidential mortgages compiled by the American Council of Life Insurance (ACLI). The council notes that its capitalization rates are derived for each loan by dividing net stabilized earnings by property value. How value is determined was not made known to the court in this matter.
The ACLI rates are in evidence as part of plaintiffs’ appraisal over the objections of counsel for the municipality specifically directed to that information. Counsel’s objections were based on the failure to relate the rates to the market in which the subject property would compete for buyers. The court overruled the objections, indicating that the objections went to weight and not to admissibility. The weight and value of expert testimony are for the trier of the facts. Robbins v. Thies, 117 N.J.L. 389, 398,189 A. 67 (E. & A.1937); Schmertz v. Dover Tp., 4 N.J.Tax 145, 152 (Tax Ct.1981). Notwithstanding the objections and the court’s ruling, the taxpayer produced no further evidence relating the ACLI data to the relevant market. In Murnick v. Asbury Park, 2 N.J.Tax. 168 (Tax Ct.1981), rev’d on other grounds 187 N.J.Super. 455, 455 A.2d 504 (App.Div. 1982), Judge Andrew discussed the limited value of such data and pointed out that the source information used by the city’s expert in that matter was obtained from 15 life insurance companies located and doing business throughout the United States. Such data is not always drawn from properties comparable to the subject. “Such published statistical material may be useful as a comparison check but is not persuasive without a showing that the subject fits the same category. Such a demonstration has not been made here.” Id. at 187.
The assessor then testified that he became assessor in August 1979 and did not participate in the making of the assessments for the tax years 1976, 1977, 1978 and 1979. The subject assessment, originally made in the 1974 revaluation, was based on the cost approach in accordance with the New Jersey Assessors’ Appraisal Manual. In preparation for trial he reviewed the property record card and the computations made in arriving at the assessment in 1974. He also reviewed the 1978 sale of *362 the subject property, and an earlier sale in 1973, and concluded that the fair market value of the subject property was the same as the 1978 sale price of $1,100,000 for the tax years 1978,1979 and 1980. Although he relied on the sale of the property, he did not investigate the financing involved in the sale. In the interest of stability of assessments, he would use the same value for the tax years 1976 and 1977. The assessor’s testimony suffered from the same lack of support as that of the taxpayer’s witness. Cf. Schmertz v. Dover Tp., 4 N.J.Tax at 152.
The comments of Judge Evers on the testimony in Herman Holding Corp. v. Montvale, 5 N.J.Tax 199 (Tax Ct.1983), are equally applicable here:
In summary I find that taxpayer’s testimony fell far short of sustaining its burden. No factual bases were given in support of the expert’s conclusions. An expert's opinion rises no higher than the data on which it is founded. Passaic v. Gera Mills [150 A.2d 67], 55 N.J.Super. 73 (App.Div.1959), certif. den. 30 N.J. 153 [152 A.2d 172] (1959). Where an expert gives an opinion of value based on his general experience without supporting such value by specific objective data, his opinion is not entitled to any probative value, [at 208]
On appeal to the Tax Court from a county board judgment or on direct appeal to the Tax Court the county board judgment and the original assessment, respectively, are presumed to be correct, and the burden of proof is on the plaintiff to show otherwise. L. Bamberger & Co. v. Tax Appeals Div., 1 N.J. 151, 62 A.2d 389 (1948). A taxpayer does not overcome this burden unless he presents sufficient competent evidence to establish a true value of the property different from the assessment. Riverview Gardens v. North Arlington, 9 N.J. 167, 87 A.2d 425 (1952). Thus, in the matters before the court plaintiffs have the burden of overcoming the presumption of correctness in favor of the judgments of the Monmouth County Board of Taxation for the years 1976, 1977, 1978 and 1979 and the original assessment for the tax year 1980. Riverview Gardens v. North Arlington, supra; Glenwood Realty Co., Inc. v. East Orange, 78 N.J.Super. 67, 187 A.2d 602 (App.Div.1963).
*363 There is no basis for a finding of value, and the presumption of correctness has not been overcome in these matters.
Since no competent proof of value was presented by the taxpayers, the claim of discrimination need not be considered. In re Kent Appeal, 34 N.J. 21, 166 A.2d 763 (1961); Continental Paper Co. v. Ridgefield Park, 122 N.J.Super. 446, 300 A.2d 850 (App.Div.1973).

 A copy of the mortgage was marked in evidence. Contrary to the witness’ testimony, the interest rate was 6% and the mortgage had a ten-year term.

The report was admitted in evidence and is discussed below.

Cf. with the "net opinion” rule set forth in Parker v. Goldstein, 78 N.J.Super. 472, 483, 189 A.2d 441 (App.Div.1963), certif. den. 40 N.J. 225, 191 A.2d 63 (1963), and commented on in Buckelew v. Grossbard, 87 N.J. 512, 525, 435 A.2d 1150 (1981); and see Dwyer v. Ford Motor Co., 36 N.J. 487, 494, 178 A.2d 161 (1962): "... [T]he reasons for the assertion are more important than the assertion itself.”

The "risk rate,” or return on investment, is to be distinguished from the "recapture rate,” or return of investment. American Inst. of Real Estate Appraisers, The Appraisal of Real Estate, (7 ed.), 372-373. The witness incorrectly used the terms interchangeably in his testimony.

See n. 4.

See n. 4.